***LEAVE TO FILE GRANTED ON JANUARY 21, 2025***

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Docket No.: 24-cv-12730-MJJ

A.D., an individual,

    Plaintiff,

    v.

CHOICE HOTELS INTERNATIONAL,
INC., WYNDHAM HOTELS & RESORTS,
INC., SIX CONTINENTS HOTELS INC.,
HOLIDAY HOSPITALITY
FRANCHISING, LLC, RED ROOF INNS,
INC., RED ROOF FRANCHISING, LLC,
and ESA MANAGEMENT, LLC.

    Defendants

**PLAINTIFF'S SECOND AMENDED COMPLAINT
AND DEMAND FOR JURY TRIAL**

NOW COMES the Plaintiff A.D. ("Plaintiff" or "A.D.") by and through her undersigned counsel, and respectfully submits her Amended Complaint for damages and makes the following averments.

**INTRODUCTION**

1. Plaintiff is a survivor of human sex trafficking.

2. A.D.'s life story, to the point she escapes, reads like a tragedy wherein she was forced to endure violence, trauma, exploitation, manipulation, threats, isolation, humiliation, and degradation.

3. A.D. met the first trafficker that subjected her to the exploitation that is the subject of this Amended Complaint in 2014. From 2014 through 2015, A.D. was sex

trafficked by three different men through many commercial hotel establishments. Ultimately, her traffickers came to control every aspect of her life. The defining factor of the relationship between A.D. and her traffickers was that each night, A.D.'s traffickers forced her to have sex with men for money.

4. A.D. was trafficked in hotels owned by Defendants[1] Choice Hotels International, Inc. ("Choice"), Wyndham Hotels & Resorts, Inc. ("Wyndham"), Six Continents Hotels Inc. ("Six Continents"), Holiday Hospitality Franchising, LLC ("Holiday Hospitality"), Red Roof Inns, Inc. and Red Roof Franchising, LLC (collectively, "Red Roof"),[2] and ESA Management, LLC. ("ESA Management").

5. A.D.'s traffickers rented hotel rooms for one purpose — a location to engage in sex trafficking.

6. At Defendants' hotels, A.D. was forced to engage in sex with many men every day. Every new customer was another instance A.D. was forced to have sex against her will – that is to say, A.D. was raped multiple times per day by multiple men when she stayed at Defendants' hotels.

7. A.D.'s traffickers forced her onto Defendants' property where she was repeatedly raped and forced to perform commercial sex acts with "buyers" under threats of physical and psychological abuse.

---

[1] Throughout this Amended Complaint, when Plaintiff refers to "Defendants," that statement is alleged as to all Defendants named in this action, including Choice, Wyndham, Six Continents, Holiday Hospital,, Red Roof Inns, Inc., Red Roof Franchising, LLC, and ESA Management. In the instances when Plaintiff alleges a fact as to only one Defendant, or some number of Defendants less than the total, the Amended Complaint clearly names the Defendant to which the allegation is made.

[2] Defendants Red Roof Inns, Inc. and Red Roof Franchising, LLC will be collectively referred to as "Red Roof."

***LEAVE TO FILE GRANTED ON JANUARY 21, 2025***

8.  At some point, A.D. was able to escape the grasps of her traffickers and the prison of Defendants' hotel rooms.

9.  A.D. has spent a considerable amount of time attempting to regain the life that was stripped away from her as a result of her trafficking.

10. A.D. seeks to hold those who harbored her traffickers accountable.

### OVERVIEW OF TRAFFICKING

11. A significant portion of all sex trafficking in the United States of America occurs within the hospitality industry at hotels and motels.

12. For decades, sex traffickers have brazenly operated in and out of hotels throughout this country. Traffickers paraded throughout hotels, while hospitality giants stood on the sidelines and did nothing. Instead, hotels and motels, while often making public statements against trafficking, did nothing to prevent its proliferation – standing by and collecting millions in profits from the trafficking occurring on their properties.

13. Defendants knew and have known for decades that they profit from sex trafficking repeatedly occurring under their brand flags.

14. Rather than taking timely and effective measures to stop profiting from this epidemic, Defendants choose to ignore the open and obvious presence of sex trafficking on their branded properties, benefitting from the profit and fees created by rooms rented and Wi-Fi provided for this explicit and apparent purpose.

15. The sex trafficking industry alone pulls in an estimated $99 billion each year,

***LEAVE TO FILE GRANTED ON JANUARY 21, 2025***

making it the second largest illicit trade after the sale of all illegal drugs.[3] However, traffickers aren't the only profiteers. The hotel industry, including Defendants, makes millions from participating in ventures that they know or should have known engage in violations of 18 U.S.C. § 1591(a) through renting rooms where sex trafficking victims are harbored night after night and providing Wi-Fi that traffickers use to advertise and solicit victims for commercial sex acts. Defendants and traffickers have a mutually beneficial relationship, fueled by the sexual exploitation of victims.

16.    Defendants and other members of the hospitality industry are and have long been aware of the prevalence of human trafficking, particularly sex trafficking, at hotels in general and at the Defendants' own properties. Defendants and others in the industry have access to much public information on the prevalence of human trafficking at hotels, including reports by, among others, the Polaris Project created for the use of the hospitality industry.

17.    The hospitality industry, speaking through industry organizations, has in recent years been increasingly vocal about its supposed "unified commitment" to combat human trafficking. Unfortunately, the near-total lack of concrete action by Defendants and the rest of the hospitality industry shows that the industry in fact has a "unified commitment" to the very opposite: continuing with business as usual, so that Defendants and all industry participants continue to profit millions from participating in a venture in violation of § 1591(a).

---

[3] *Profits and Poverty: The Economics of Forced Labor,* INTERNATIONAL LABOR ORGANIZATION (2017), https://www.ilo.org/global/topics/forced-labour/statistics/lang--en/index.htm.

18. Defendants' decision to prioritize profits over protecting sex trafficking victims resulted in the repeated sexual exploitation and rape of A.D. on their properties.

19. A.D. is a survivor of sex trafficking. Key findings from the Polaris Project are that "[s]urvivors of human trafficking are not thriving. The systems that were supposed to protect them before, during and after their human trafficking situations failed and failed miserably. Systems such as child welfare, criminal justice and legal systems — failed." https://polarisproject.org/national-survivor-study/

20. A.D. looks to the judicial system, who has been empowered by Congress to provide a remedy to Victim-Survivors pursuant to the Trafficking Victim Protection Reauthorization Act, 18 U.S.C. § 1595 and Child Abuse Victim's Rights Act, 18 U.S.C. § 2255. Each Defendant, knowingly benefitted from participation in a venture that it knew or should have known to be engaging in violations of 18 U.S.C. § 1591(a).

**PARTIES**

21. Plaintiff A.D. is a natural person and a resident and citizen of Worcester, Massachusetts.

22. Plaintiff is a victim of trafficking pursuant to 22. U.S.C. § 7102(17) and 18 U.S.C. § 1591(a), and a victim of a "severe form of trafficking" as defined under 22 U.S.C. § 7102(16).

    a. Due to the sensitive and intimate nature of the issues, Plaintiff A.D. requests that this Court grant a protective order pursuant to Fed. R. Civ. P. 26(c) to permit her to proceed under a pseudonym and to ensure that Defendants maintain the confidentiality of Plaintiff's identity throughout the pendency

of this lawsuit and after.[4]

b.    Generally, under the Federal Rules of Civil Procedure, pleadings must state the name of all parties.[5] However, there are exceptions when the issues involved are of a sensitive and highly personal nature.[6] For good cause, the Court may issue an order to protect a party or person from annoyance, embarrassment, oppression or undue burden or expense.[7]

c.    Here, granting pseudonym status and proceeding under seal is warranted because this litigation will involve the disclosure of stigmatizing sexual information, including rape. Plaintiff fears the stigma from her family, friends, employer, and community if her true identity is revealed in the public record.

d.    Plaintiff should not be compelled to disclose her identity in order to maintain her privacy and safety. Plaintiff's privacy interest substantially outweighs the customary practice of judicial openness.[8]

---

[4] In cases where the plaintiffs have demonstrated a need for anonymity, the district court should use its powers to manage pretrial proceedings under Fed. R. Civ. P. 16(b), and to issue protective orders limiting disclosure of the party's name under Fed. R. Civ. P. 26(c), to preserve the party's anonymity to the greatest extent possible without prejudicing the opposing party's ability to litigate the case. *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1069 (9th Cir. 2000).

[5] Fed. R. Civ. P. 10(a).

[6] A district court must balance the need for anonymity against the general presumption that the parties' identities are public information and the risk of unfairness to the opposing party. *See, e.g., M.M. v. Zavaras*, 139 F.3d 798, 803 (10th Cir.1998); *James v. Jacobson*, 6 F.3d at 238 (4th Cir. 1993); *Doe v. Frank*, 951 F.2d 320, 323–24 (11th Cir.1992); *Doe v. Stegall*, 653 F.2d at 186 (5th Cir.); *see also Doe v. Frank* at 323 (11th Cir. 1992) (holding that a plaintiff should be permitted to proceed anonymously in cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity).

[7] Fed. R. Civ. P. 26(c).

[8] *Does I thru XXIII, 214 F.3d* at 1068 (joining its 4th, 5th, 10th, and 11th sister circuits in holding

***LEAVE TO FILE GRANTED ON JANUARY 21, 2025***

e. Moreover, Defendants will not be prejudiced. Plaintiff will agree to reveal her identity to Defendants for the limited purpose of investigating Plaintiff's claims once the parties have entered into a protective order. Plaintiff simply seeks redaction of Plaintiff's personal identifying information from the public docket and assurances that Defendants will not use or publish Plaintiff's identity in a manner that will compromise her safety, personal life, personal relationships, or future employment prospects.

23. **Defendant Choice Hotels International, Inc.** ("Choice") is one of the largest hotel franchisors in the world and offers its brand public lodging services through its affiliates, subsidiaries, and franchisees. It is a Delaware corporation with its headquarters in Rockville, Massachusetts and can be served through its registered agent, Corporation Service Company, 84 State Street, Boston, MA 02109.

24. Choice owns, supervises, manages, controls, and/or operates or did operate at all relevant times the Quality Inn located at 440 Bedford Street, Lexington, MA 02420 and the Econo Lodge located at 1186 Worcester Road, Framingham, MA 01701.

a. Quality Inn by Choice and Econo Lodge are Choice brand properties.[9]

b. Choice employees work throughout the Quality Inn and Econo Lodge by Choice. Choice employees work jobs including front desk and housekeeping. Choice is the principal with control over nearly every element of operations at the Quality Inn and Econo Lodge by Choice.

---

that a party may preserve his or her anonymity in judicial proceedings in special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity).

[9] *Our Brands*, CHOICE HOTELS, https://www.choicehotels.com/about/brands (last visited Jun. 9, 26 2022).

***LEAVE TO FILE GRANTED ON JANUARY 21, 2025***

Choice is liable, either directly, vicariously, or indirectly through an agency relationship for the acts and/or omissions of the employees at its branded hotels, including the Quality Inn and Econo Lodge by Choice by Choice where A.D. was trafficked.[10] Choice has an actual and apparent agency relationship with the physical property owner of the Quality Inn and Econo Lodge by Choice as to establish vicarious liability.

c.      Choice controlled and dictated the actions and inactions of the Quality Inn and Econo Lodge by Choice through highly specific and detailed brand standards, policies, and procedures.

d.      Choice knowingly benefited, or received something of value, from its commercial business ventures at the Quality Inn and Econo Lodge by Choice through royalty payments, licensing fees, and percentages of the gross room revenue generated by the hotel operations, including rates charged through rooms where A.D. was trafficked, as well as in maintaining a positive public image for the Choice brand. Choice also benefited from gathering personal data from the Wi-Fi it provided to customers including A.D. and her traffickers.

e.      Choice is subject to the jurisdiction of this Court because it regularly conducts business in Massachusetts, including through the operation of numerous hotels in Massachusetts, contracting to supply services in Massachusetts. Choice has derived substantial revenue from services

---

[10] See, e.g., *Revenue Management*, RED ROOF, https://www.redrooffranchising.com/revenue-management (last visited Jun. 9, 2022) (proclaiming "Our Team is an Extension of Yours").

***LEAVE TO FILE GRANTED ON JANUARY 21, 2025***

rendered in Massachusetts.

f.      Whenever reference is made in this Amended Complaint to any act, deed, or conduct of Choice, the allegation is that Choice engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Choice.

25.   **Defendant Wyndham Hotel & Resorts, Inc.** ("Wyndham") is a large hotel brand with nearly 9,000 branded properties worldwide. Wyndham is a Delaware corporation with its principal place of business in Parsippany, New Jersey.

26.   Wyndham maintains a registered agent in Ohio, and it can be served through its registered agent, Corporate Creations Network, Inc., at 225 Cedar Hill Street, #200, Marlborough, MA 01752.

27.   Wyndham is the successor entity to Wyndham Worldwide Corporation and retains successor liability for the wrongful acts of its predecessor. Where applicable, references to Wyndham in this Amended Complaint refer also to Wyndham Worldwide Corporation.

28    Wyndham owned, supervised, managed, controlled, and/or operated: the Days Inn located 889 Boston Turnpike, Shrewsbury, MA 01545.

a.      The Days Inn is a Wyndham brand properties.[11]

b.      Wyndham employees worked throughout the Massachusetts Wyndham

---

[11] *Our Brands,* Wyndham Hotels, https://www.wyndhamhotels.com/wyndham-rewards/our-brands (last visited September 27, 2022).

***LEAVE TO FILE GRANTED ON JANUARY 21, 2025***

Branded Properties. Wyndham employees worked jobs including front desk and housekeeping. Wyndham is the principal with control over nearly every element of operations at the Days Inn Wyndham Branded Properties. Wyndham is liable, either directly, vicariously, or indirectly through an agency relationship for acts and/or omissions of the employees at its branded hotels, including the Days Inn Wyndham Branded Properties where A.D. was trafficked. Wyndham has an actual and apparent agency relationship with the physical property owners of the Days Inn Wyndham Branded Properties to establish vicarious liability.

c.    Wyndham controlled and dictated the actions and inactions of the Days Inn Wyndham Branded Properties through highly specific and detailed brand standards, policies, and procedures.

d.    Wyndham knowingly benefited, or received something of value, from its ventures at the Days inn Wyndham Branded Properties through royalty payments, licensing fees, and percentages of the gross room revenue generated by the hotel operations, including rates charged through rooms where A.D. was trafficked, as well as in maintaining a positive public image for the Days Inn Wyndham Branded Properties. Wyndham also benefited from gathering personal data from the Wi-Fi it provided to customers including A.D. and her trafficker.

e.    Wyndham is subject to the jurisdiction of this Court because it regularly conducts business in Massachusetts, including through the operation of numerous hotels in Massachusetts, contracting to supply services in

10

***LEAVE TO FILE GRANTED ON JANUARY 21, 2025***

Massachusetts. Wyndham has derived substantial revenue from services rendered in Massachusetts.

f.    Whenever reference is made in this Amended Complaint to any act, deed, or conduct of Wyndham, the allegation is that Wyndham engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Wyndham.

29.    **Defendant Six Continents Hotels Inc.** ("Six Continents") is the ultimate parent company for a United Kingdom incorporated corporation InterContinental Hotels Group PLC ("IHG") in the United States. Six Continents manages the brands of approximately 5,600 hotels throughout almost 100 countries. Defendant Six Continents is responsible for all brand standards for IHG brand hotels in the United States. Defendant Six Continents also owns, operates, or otherwise manages the software program for making reservations at IHG brand hotels. Defendant Six Continents may be served with service of process by serving its registered agent, United Agent Group, Inc. at 225 Cedar Hill Street, #200, Marlborough, MA 01752.

30.    **Defendant Holiday Hospitality Franchising, LLC** ("Holiday Hospitality") is a wholly owned subsidiary of IHG. It is a Delaware corporation and can be served by its registered agent United Agent Group, Inc. at 225 Cedar Hill Street, #200, Marlborough, MA 01752. Holiday Hospitality is the U.S. franchising entity for IHG. Six Continents, through Holiday Hospitality, provides franchise opportunities for its Crowne Plaza branded hotels. Crowne Plaza by IHG is classified as a value

brand hotel.

31.     Six Continents and Holiday Hospitality Defendants[12] owns, supervises, manages, controls and/or operates the Crowne Plaza located at 15 Middlesex Canal Park Drive, Woburn, MA 01801 and 320 Washinigton Street, Newton, MA 02458 as well as the Holiday Inn Express located 315 Mishawum Road, Woburn, MA 01801.

a.    The Crowne Plaza are Six Continents and Holiday Hospitality branded properties.[13]

b.    The Holiday Inn Express are Six Continents and Holiday Hospitality branded properties.

c.    Six Continents and Holiday Hospitality employees work throughout the Crowne Plaza and Holiday Inn Express. Six Continents and Holiday Hospitality employees work jobs including front desk and housekeeping. Six Continents and Holiday Hospitality are the principal entities with control over nearly every element of operations at the Crowne Plaza and Holiday Inn Express. Six Continents and Holiday Hospitality are liable, either directly, vicariously, or indirectly through an agency relationship, for the acts and/or omissions of the employees at its branded hotels, including the Crowne Plaza and Holiday Inn Express where A.D. was trafficked. Six Continents and Holiday Hospitality has an actual and apparent agency

---

[12] Six Continents and Holiday Hospitality are subsidiaries of the foreign parent company International Hotel Group, PLC, which upon information and belief does not handle U.S. operations.

[13] *Our Brands*, IHG, https://www.ihg.com/content/us/en/about/brands (last visited Jun. 15, 2022).

***LEAVE TO FILE GRANTED ON JANUARY 21, 2025***

relationship with the physical property owners of the Crowne Plaza and Holiday Inn Express as to establish vicarious liability.

d.  Six Continents and Holiday Hospitality controlled and dictated the actions and inactions of the Crowne Plaza and Holiday Inn Express through highly specific and detailed brand standards, policies, and procedures.

e.  Six Continents and Holiday Hospitality Defendants knowingly benefited, or received something of value, from its commercial business venture at the Crowne Plaza and Holiday Inn Express through royalty payments, licensing fees, and percentages of the gross room revenue generated by the hotel operations, including rates charged through rooms where A.D. was trafficked, as well as in maintaining a positive public image for the Crowne Plaza brand.

f.  Six Continents and Holiday Hospitality Defendants are subject to the jurisdiction of this Court because it regularly conducts business in Massachusetts, including through the operation of numerous hotels in Massachusetts, such as the Crowne Plaza, Holiday Inn, and Holiday Inn Express, contracting to supply services in Massachusetts. Six Continents and Holiday Hospitality Defendants have derived substantial revenue from services rendered in Massachusetts, has caused injuries to A.D. in Massachusetts, and profited from a commercial business venture which unlawfully permitted criminals to sell A.D. for commercial sex at the Six Continents and Holiday Hospitality properties in Massachusetts.

32.  **Defendant Red Roof Inns, Inc ("RRI").** is a publicly traded company. The

company provides franchise opportunities for its hotel and motel brands through **Defendant Red Roof Franchising, LLC ("RRF") (together "Red Roof")**.[14] Red Roof purchases, owns, and manages a network of hotels and motels globally, primarily in the Midwest, Southern, and Eastern United States. Red Roof serves customers throughout the United States and other countries throughout the World.

33. RRI is a global hotel brand with approximately 650 branded properties worldwide. It is a Delaware corporation, with its corporate headquarters and principal place of business at 7815 Walton Pkwy, New Albany, Ohio 43054.

34. RRI maintains a registered agent in Massachusetts, and it can be served through its registered agent, Corporation Service Company, 84 State Street, Boston, MA 02109.

35. RRF was named one of the fastest growing franchises in 2017. It is a Delaware limited liability company with its corporate headquarters and principal place of business at 7815 Walton Pkwy, New Albany, Ohio 43054.

36. RRF maintains a registered agent in Ohio, and it can be served through its registered agent, Corporation Service Company, 84 State Street, Boston, MA 02109.

37. Red Roof owns, supervises, manages, controls, and/or operates the Red Roof Inn located at 19 Commerce Way, Woburn, MA 01801.

   a. The Woburn Red Roof Inn is a Red Roof branded property.[15]

   b. Red Roof employees work throughout the Woburn RRI by Red Roof. Red

---

[14] Upon information and belief, Red Roof Franchising, LLC is a wholly owned subsidiary of Red Roof Inns, Inc. and serves as Red Roof Inns, Inc.'s franchising arm.

[15] *Our Brands*, RED ROOF, https://www.redrooffranchising.com (last visited Jun. 9, 2022); *Red Roof Inn*, RED ROOF, https://www.redrooffranchising.com/red-roof-inn (last visited Jun. 9, 2022).

***LEAVE TO FILE GRANTED ON JANUARY 21, 2025***

Roof employees work jobs including front desk and housekeeping. Red Roof is the principal with control over nearly every element of operations at the Woburn RRI by Red Roof. Red Roof is liable, either directly, vicariously, or indirectly through an agency relationship for the acts and/or omissions of the employees at its branded hotels, including the Woburn RRI by Red Roof where A.D. was trafficked. Red Roof has an actual and apparent agency relationship with the physical property owner of the Woburn RRI by Red Roof as to establish vicarious liability.

c.    Red Roof controlled and dictated the actions and inactions of the Woburn RRI by Red Roof through highly specific and detailed brand standards, policies, and procedures.

d.    Red Roof knowingly benefited, or received something of value, from its ventures at the Woburn RRI through royalty payments, licensing fees, and percentages of the gross room revenue generated by the hotel operations, including rates charged through rooms where A.D. was trafficked, as well as maintaining a positive public image for the Red Roof Inn brand. Red Roof also benefited from gathering personal data from the Wi-Fi it provided to customers including A.D. and her trafficker.

e.    Red Roof regularly conducts business in Massachusetts, including through the operation of numerous hotels in Massachusetts, contracting to supply services in Massachusetts. Red Roof has derived substantial revenue from services rendered in Massachusetts.

f.    Whenever reference is made in this Amended Complaint to any act, deed,

***LEAVE TO FILE GRANTED ON JANUARY 21, 2025***

or conduct of Red Roof, the allegation is that Red Roof engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Red Roof.

38. **ESA Management, LLC** is a domestic corporation. The company owns and provides franchise opportunities for its hotel and motel brands. ESA Management owns, and manages a network of hotels, primarily in North America.

39. ESA Management maintains a registered agent in Massachusetts, and it can be served through its registered agent, National Registered Agents, Inc., 155 Federal Street, Suite 700, Boston, MA 02110.

40. ESA Management owns, supervises, manages, controls, and/or operates the Extended Stay Americas located at 180 Easy Main Street, Westborough, MA 01581; 1800 Computer Drive Westborough, MA 01581; and 19 Connector Road, Westborough, MA 01581 ("the properties").

   a. Upon information and belief, ESA Management employees work throughout the properties. ESA Management employees work jobs including front desk and housekeeping. ESA Management is the principal with control over nearly every element of operations at the properties. ESA Management is liable, either directly, vicariously, or indirectly through an agency relationship for the acts and/or omissions of the employees at its branded hotels, including the Extended Stay America locations where A.D. was trafficked. ESA Management has an actual and apparent agency

16

relationship with the physical property owner of Extended Stay America properties at 180 Easy Main Street, Westborough, MA 01581; 1800 Computer Drive, Westborough, MA 01581; and 19 Connector Road, Westborough, MA 01581 as to establish vicarious liability.

b.    ESA Management controlled and dictated the actions and inactions of the properties through highly specific and detailed brand standards, policies, and procedures.

c.    ESA Management knowingly benefited, or received something of value, from its ventures at the properties through royalty payments, licensing fees, and percentages of the gross room revenue generated by the hotel operations, including rates charged through rooms where A.D. was trafficked, as well as maintaining a positive public image for the Extended Stay America brand. ESA Management also benefited from gathering personal data from the Wi-Fi it provided to customers including A.D. and her trafficker.

d.    ESA Management regularly conducts business in Massachusetts, including through the operation of numerous hotels in Massachusetts, contracting to supply services in Massachusetts. ESA Management has derived substantial revenue from services rendered in Massachusetts.

e.    Whenever reference is made in this Amended Complaint to any act, deed, or conduct of ESA Management, the allegation is that ESA Management engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively

17

***LEAVE TO FILE GRANTED ON JANUARY 21, 2025***

engaged in the management, direction, control, or transaction of the ordinary business and affairs of ESA Management.

## JURISDICTION AND VENUE

41. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

42. The Court has personal jurisdiction pursuant to the William Wilberforce Trafficking Victims Protection Reauthorization Act ("TVPRA") and 18 U.S.C. § 2255, Child Abuse Victims' Rights Act ("CAVRA").

43. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3) because the Court has personal jurisdiction over Defendants Choice, Wyndham, RRI, Holiday Hospitality and Six Continents, and ESA Management.

## FACTUAL BACKGROUND

### INTRODUCTION

44. A.D. brings her claims against major hotel brand corporations for violations of the Trafficking Victims Protection Reauthorization Act ("TVPRA") 18 U.S.C. § 1595(a) and the Child Abuse Victim's Rights Act ("CAVRA"), 18 U.S.C. § 2255.

45. The TVPRA prohibits Defendants from profiting from any venture they know or should know involves a violation of § 1591, and thereby establishes a non-delegable duty of reasonable care.

46. An overwhelming majority of commercial sex trafficking transactions occur within the hotels and motels, as traffickers use their rooms as the hub for their operations.[16]

---

[16] Bradley Myles, *Combating Human Trafficking in the Hotel Industry*, HUFFINGTON POST (Jul. 22, 2015), https://www.huffpost.com/entry/combating-human-trafficking-in-the-hotel-industry_b_ 7840754.

Hotels offer anonymity and non-traceability, privacy, and discretion, making them ideal venues for sex trafficking. Inside, the victims are harbored, raped, assaulted, and forced to service buyers who come to the hotel solely to purchase sex. In addition, traffickers regularly use Defendants' Wi-Fi to advertise and solicit victims for commercial sex against their will.

47. As part of their conspiracy, to save costs and continually reap millions of dollars in profits, Defendants generally failed to create, adopt, implement, and enforce company-wide policies and procedures regarding suspected incidents of human trafficking at the branded properties – despite the general knowledge in the industry and their own corporate records that human sex trafficking was happening in the hotel industry and in their branded properties. Furthermore, Defendants did not train staff how to identify and respond to suspected human trafficking, failed to require training of all employees on human trafficking policies and procedures, and failed to conduct audits confirming compliance with policies and procedures.

48. Defendants kept no reports or data on suspected incidences or occurrences of human trafficking on their properties and the rate at which those occurrences changed as a result of implementing human trafficking policies and procedures. Defendants did not establish a mandatory and secure reporting mechanisms at the point of sale.

49. Despite the proven ability to respond to important societal issues such as COVID-19 by modifying the brand standards to keep guests safe, Defendants did nothing in the face of the human sex trafficking epidemic in their industry. Instead, they continued to profit from the rental of rooms that they knew or should have known

***LEAVE TO FILE GRANTED ON JANUARY 21, 2025***

were rented and used for the purpose of sex trafficking.

50.    Defendants thus failed to act to ensure that it did not benefit from the human sex trafficking occurring at its branded properties. Defendants failed to implement appropriate policies and procedures that a reasonably diligent corporation would or should have implemented so that it would not continue to benefit from the human trafficking occurring at their branded properties.

51.    With little to no risk posed to traffickers seeking to use Defendants' rooms as a location to force victims like A.D. to engage in commercial sex against her will, the sex trade continues to thrive at Defendants' branded properties while Defendants reap the benefits.

52.    Plaintiff's injuries are indivisible and cannot be separated. Plaintiff's injuries are the result of continued instances of ongoing violent traumatizing sexual exploitation.

53.    Plaintiffs' injuries are almost exclusively mental, emotional, and psychological in nature and derive from the trafficking period. A trafficking period is ongoing and continuous and resulting injuries cannot be divided; thereby subjecting the Hotel Defendants to joint and several liability. Federal common law provides for joint and several liability for indivisible injuries, such as those suffered by Plaintiff.

54.    Plaintiffs' injuries – particularly Plaintiff's ongoing mental, emotional, and psychological injuries – have no reasonable basis on which to determine the relative contribution of a particular defendant conduct to the single harm.

55.    Violators of Section 1595 of the TVPRA are jointly and severally liable for a victim's damages. Victims are entitled to all compensatory and non-compensatory

20

***LEAVE TO FILE GRANTED ON JANUARY 21, 2025***

damages incurred during their trafficking period. 18 U.S.C. §1595(a). Thus, Defendants are jointly and severally liable for the Plaintiff's damages in this case.

### THE SEX TRAFFICKING OF PLAINTIFF A.D.

56. A.D. was originally kidnapped by her traffickers when she was just eighteen (18) years old.

57. By means of a combination of force, coercion, violence, threats, manipulation, compelled use of and dependency on illegal substances, control over identity and possessions, and deprivation of basic survival necessities such as, but not limited to, food, water, transportation, shelter, and clothing, A.D. was held captive and sold for sex by her traffickers.

58. During the time that she was trafficked, A.D.'s traffickers frequently rented rooms at Defendants' hotel locations because the rooms provided convenient, anonymous, and relatively central locations for "johns" who would pay to engage in sex with A.D.

59. Throughout her trafficking, A.D.'s traffickers connected with "johns" by posting or causing to be posted advertisements on Backpage advertising for A.D.'s availability for commercial sex. A.D.'s traffickers posted many of these advertisements and had conversations with "johns" while connected to Defendants' Wi-Fi.

60. A.D. was forced to have sex with multiple "johns" every day she was trafficked in Defendants' hotels.

61. Hotels were booked through Hotels.com and other travel sites using A.D.'s identity and banking information.

***LEAVE TO FILE GRANTED ON JANUARY 21, 2025***

62. From approximately 2014 to late 2015, while under the coercive control of trafficker, A.D. was imprisoned in hotel rooms rented by her traffickers and forced her to have sex for money. During that time, A.D. was trafficking in the following hotels:

   a. Quality Inn located at 440 Bedford Street, Lexington, MA 02420;

   b. Extended Stay America located at 180 East Main Street, Westborough, MA 01581;

   c. Extended Stay America located at 1800 Computer Drive, Westborough, MA 01581;

   d. Extended Stay America located at 19 Connector Road, Westborough, MA 01581;

   e. Days Inn by Wyndham located at 889 Boston Turnpike, Shrewsbury, MA 01545;

   f. Crowne Plaza located at 15 Middlesex Canal Park Drive, Woburn, MA 01801;

   g. Crowne Plaza located at 320 Washington Street, Newton, MA 02458;

   h. Red Roof Inn located at 19 Commerce Way, Woburn, MA 01801;

   i. Holiday Inn Express located at 315 Mishawum Road, Woburn, MA 01801;

   j. Econo Lodge located at 1186 Worcester Road, Framingham, MA 01701;

63. During the time she was trafficked, A.D.'s traffickers constantly shuffled her back and forth among hotels, often visiting the same hotels repeatedly at intervals.

64. While at Defendants' hotels, A.D.'s traffickers violently attacked and beat her, and psychologically tormented her by withholding essentials needed for survival, all to

22

ensure that she could not escape.

65. During her captivity at Defendants' hotels, A.D. was raped, continuously abused physically and verbally, malnourished, psychologically tormented, kidnapped, and imprisoned in Defendants' brand hotels listed above.

66. At the above listed hotels, A.D. encountered the same staff on multiple occasions. Defendants' staff would have seen the signs of A.D.'s deterioration brought on by the abuse perpetrated by her traffickers, including bruising and physical and verbal abuse occurring in public areas of Defendants' properties as well as signs of malnutrition and poor health.

67. Every time A.D. interacted with Defendants' staff, it was readily apparent that A.D. was under the control of her traffickers. A.D.'s traffickers, who were significantly older than A.D., checked in to Defendants' hotels using their own names or her name.

68. A.D.'s traffickers followed a repetitive and routine procedure during stays at Defendants' hotels and Defendants' hotels knew or should have known of A.D.'s trafficking because of a variety of factors detailed below:

## THE SEX TRAFFICKING AT THE
## LEXINGTON QUALITY INN

69. Plaintiff A.D. was subjected to sex trafficking at the Choice branded, Quality Inn located at 440 Bedford Street, Lexington, MA 02420.

70. Plaintiff and her trafficker stayed at this Quality Inn by Choice between Summer 2014 and Fall 2015.

71. A.D.'s trafficker used this location multiple times during 2014 and 2015 and each stay was up to three nights.

23

72. A.D.'s trafficker would put up to three sex-trafficking survivors in one room with him where they would conduct dates with buyers.

73. While one survivor was engaged with a buyer, the other survivors would wander the halls of the hotel, stand around in stairways, stay in the common areas, or outdoor areas, visible to the staff.

74. A.D.s trafficking was obvious to the staff as the front desk staff would obviously and intentionally avoid making eye contact with A.D. and the housekeeping staff would roll their eyes when they passed A.D. in the hall.

75. A.D.'s trafficker would bring in a minimum of 10 buyers per survivor and as many as 15 for a total of 30 to 45 buyers entering the hotel each day they were there.

76. On more than one occasion, the police were called for a drug overdose in their room.

77. On one particular occasion, A.D. was robbed at gunpoint by a buyer. She screamed and yelled for help and the hotel staff did not alert the authorities or provide any assistance.

78. There was constant foot traffic in and out of A.D.'s room. At all hours of the day and the night, the staff witnessed "johns" – who were significantly older than A.D. – come into the main entrance and to A.D.'s room. The staff also had access to security camera footage documenting the constant stream of buyers from cameras.

79. Further, with each stay at the Quality Inn by Choice, it resulted in several consistent red flags, including, but not limited to: paying for stays in cash; paying for extended stays on a day-by-day basis; requesting a room away from other guests; obvious signs of illegal drug use; frequent requests for linen changes; unusually large

24

***LEAVE TO FILE GRANTED ON JANUARY 21, 2025***

number of used condoms in the trash; unusually large number of male visitors asking for A.D. and her traffickers at the front desk; visible signs of prior and private physical abuse; unusually large number of male visitors coming in and out of the room; asking the front desk not to be disturbed; women wearing clothing inappropriate for the weather; loud noises of abuse or other emergency audible to staff or other rooms; and loitering and soliciting on hotel grounds.

80. A.D.'s traffickers were very violent with her and loud sounds of abuse and A.D.'s screams for help could often be heard from the room.

81. Plaintiff was repeatedly raped and otherwise sexually abused hundreds of times at the Quality Inn by Choice.

82. These red flags were open and obvious to anyone working at the Quality Inn by Choice.

### THE SEX TRAFFICKING OF A.D. AT THE WESTBOROUGH EXTENDED STAY AMERICA

83. Plaintiff A.D. was subjected to sex trafficking at the Extended Stay America located at 180 East Main Street, Westborough, MA; 1800 Computer Drive, Westborough, MA; and 19 Connector Road, Westborough, MA.

84. Plaintiff and her trafficker moved between these three locations, along an area referred to as the "Route 9 Corridor," between Winter 2014 and November 3, 2015, frequently staying at each location for up to a week at a time.

85. Plaintiff would occasionally be asked to show ID when checking into these locations. The ID she used was not hers and the photo did not look like her.

86. One survivor would be sent to check in, while the trafficker and other survivors would stay in the car. The group would then use the back entrance to enter the hotel.

87.  A.D.'s trafficker would put multiple sex-trafficking survivors in each rented room where they would meet with buyers.

88.  While one survivor was engaged with a buyer, the other survivors would be relegated to wandering the hall of the hotel, standing around outside the hotel, or staying in the common areas, visible to the staff.

89.  A.D. had notable signs of substance abuse, including malnourishment, bruising, and track marks on visible parts of her body including her neck.

90.  At the 19 Connector Road location, the front desk employee would ask the survivors a lot of questions about themselves and their work, clearly seeking a sexual encounter while they were staying at the hotel.

91.  Westborough Police would regularly conduct warrant checks at each location as they were known to be hotbeds of criminal activity.

92.  A.D.'s trafficker would bring in a minimum of 10 buyers per survivor and as many as 15 for a total of 30 to 45 buyers entering the hotel each day they were there.

93.  Plaintiff was repeatedly raped and otherwise sexually abused hundreds of times at these Extended Stay properties.

94.  Further, with each stay at the Extended Stay America, it resulted in several consistent red flags, including, but not limited to: paying for stays in cash; paying for extended stays on a day-by-day basis; requesting a room away from other guests; obvious signs of illegal drug use; frequent requests for linen changes; unusually large number of used condoms in the trash; unusually large number of male visitors asking for A.D. and her traffickers at the front desk; visible signs of prior and private physical abuse; unusually large number of male visitors coming

26

***LEAVE TO FILE GRANTED ON JANUARY 21, 2025***

in and out of the room; asking the front desk not to be disturbed; women wearing clothing inappropriate for the weather; loud noises of abuse or other emergency audible to staff or other rooms; and loitering and soliciting on hotel grounds.

95. These red flags were open and obvious to anyone working at the Extended Stay Properties.

96. Upon information and belief, these properties shared information about guests, bookings, and individuals of concern.

## SEX TRAFFICKING OF A.D. AT THE
## DAYS INN BY WYNDHAM

97. Plaintiff A.D. was subjected to sex trafficking at the Days Inn by Wyndham located at 889 Boston Turnpike, Shrewsbury, MA 01545.

98. Plaintiff and her trafficker stayed at this Days Inn by Wyndham between Spring 2014 and Summer 2015.

99. This location did not request a credit card for the file for incidentals or any identification during check-in.

100. The front desk staff were directly aware that trafficking was taking place at this location, taking regular kickbacks from the proceeds of A.D.'s abuse.

101. Staff at this location were being paid not to call the police or otherwise interfere with the traffickers ongoing use of this location.

102. A.D.'s trafficker would regularly rent rooms without the use of valid identification. Front desk staff would accept additional cash payment in the amount of $200 to not require identification for check-in.

103. Further, with each stay at the Days Inn by Wyndham, it resulted in several consistent red flags, including, but not limited to: paying for stays in cash; paying

for extended stays on a day-by-day basis; requesting a room away from other guests; obvious signs of illegal drug use; frequent requests for linen changes; unusually large number of used condoms in the trash; unusually large number of male visitors asking for A.D. and her traffickers at the front desk; visible signs of prior and private physical abuse; unusually large number of male visitors coming in and out of the room; asking the front desk not to be disturbed; women wearing clothing inappropriate for the weather; loud noises of abuse or other emergency audible to staff or other rooms; and loitering and soliciting on hotel grounds.

104. These red flags were open and obvious to anyone working at the Days Inn by Wyndham.

105. A.D. and her trafficker stayed at this location for one night at a time for a total of 10-15 days between Spring 2014 and Summer 2015.

## SEX TRAFFICKING OF A.D. AT THE CROWNE PLAZA

106. Plaintiff A.D. was subjected to sex trafficking at the Crowne Plazas located at 15 Middlesex Canal Park Drive, Woburn, MA 01801 and 320 Washington Street, Newton, MA 02458.

107. Plaintiff and her trafficker stayed at these Crowne Plaza between February or March 2013 and early 2015.

108. At the Woburn location, Plaintiff was regularly approached by the Woburn Police.

109. After being arrested at nearby Red Roof Inn hotel, Plaintiff came to this hotel for respite.

110. During her stays at these locations, Plaintiff was in the throes of severe substance abuse and appeared malnourished with visible track marks on her neck.

111. A.D.'s trafficker used this location multiple times during 2014 and 2015 and each stay was up to two nights.

112. A.D.'s trafficker would hide drugs for the survivors around the hotel, under flowerpots and behind paintings on different floors in locations that staff or other patrons would have had access to. This included under a trash barrel in the lobby. This activity would have been visible to any staff or surveillance cameras.

113. After completing the transaction with a buyer, Plaintiff would send a picture of the cash to the trafficker, who would then tell her the location of the hidden drugs, and she should go obtain them.

114. Further, with each stay at the Crowne Plazas, it resulted in several consistent red flags, including, but not limited to: paying for stays in cash; paying for extended stays on a day-by-day basis; requesting a room away from other guests; obvious signs of illegal drug use; frequent requests for linen changes; unusually large number of used condoms in the trash; unusually large number of male visitors asking for A.D. and her traffickers at the front desk; visible signs of prior and private physical abuse; unusually large number of male visitors coming in and out of the room; asking the front desk not to be disturbed; women wearing clothing inappropriate for the weather; loud noises of abuse or other emergency audible to staff or other rooms; and loitering and soliciting on hotel grounds.

115. These red flags were open and obvious to anyone working at the Crowne Plazas.

## SEX TRAFFICKING OF A.D. AT THE
## RED ROOF INN

116. Plaintiff A.D. was subjected to sex trafficking at the Red Roof Inn located at 19 Commerce Way, Woburn, MA.

***LEAVE TO FILE GRANTED ON JANUARY 21, 2025***

117. A.D. and her trafficker stayed at this Red Roof Inn multiple times in the late Fall of 2014.

118. A.D. was arrested at this location in 2014 in view of staff and patrons.

119. A.D. and her trafficker continued to stay at this hotel after the time of her arrest.

120. Further, with each stay at the Red Roof Inn, it resulted in several consistent red flags, including, but not limited to: paying for stays in cash; paying for extended stays on a day-by-day basis; requesting a room away from other guests; obvious signs of illegal drug use; frequent requests for linen changes; unusually large number of used condoms in the trash; unusually large number of male visitors asking for A.D. and her traffickers at the front desk; visible signs of prior and private physical abuse; unusually large number of male visitors coming in and out of the room; asking the front desk not to be disturbed; women wearing clothing inappropriate for the weather; loud noises of abuse or other emergency audible to staff or other rooms; and loitering and soliciting on hotel grounds.

121. These red flags were open and obvious to anyone working at the Red Roof Inn.

### SEX TRAFFICKING OF A.D. AT THE HOLIDAY INN EXPRESS BY SIX CONTINENTS AND HOLIDAY HOSPITALITY

122. Plaintiff A.D. was subjected to sex trafficking at the Holiday Inn Express located at 315 Mishawum Road, Woburn, MA 01801.

123. Plaintiff and her trafficker stayed at this Holiday Inn Express between 2013 and 2015.

124. Multiple survivors were trafficked through this location and Plaintiff would take over the rooms when they would leave, regularly switching the occupants within the same rooms.

125. Plaintiff was arrested and FIO'd at this location during a sting conducted by the Woburn Police. This occurred on more than one occasion and other survivors had also been detained.

126. Shortly after her arrest, Plaintiff returned to the same hotel and went back to the same room where she continued to be trafficked without intervention by hotel staff.

127. A.D. was arrested at this location late Fall of 2014 by the Woburn Police Department.

128. A.D. and her trafficker continued to stay at this hotel multiple times after the time of her arrest.

129. Plaintiff and her trafficker stayed at this location 2-3 nights per stays, approximately once per month.

130. Further, with each stay at the Holiday Inn Express, it resulted in several consistent red flags, including, but not limited to: paying for stays in cash; paying for extended stays on a day-by-day basis; requesting a room away from other guests; obvious signs of illegal drug use; frequent requests for linen changes; unusually large number of used condoms in the trash; unusually large number of male visitors asking for A.D. and her traffickers at the front desk; visible signs of prior and private physical abuse; unusually large number of male visitors coming in and out of the room; asking the front desk not to be disturbed; women wearing clothing inappropriate for the weather; loud noises of abuse or other emergency audible to staff or other rooms; and loitering and soliciting on hotel grounds.

131. These red flags were open and obvious to anyone working at the Holiday Inn Express.

***LEAVE TO FILE GRANTED ON JANUARY 21, 2025***

**SEX TRAFFICKING OF A.D. AT THE
ECONO LODGE BY CHOICE**

132.    Plaintiff A.D. was subjected to sex trafficking at the Choice branded Econo Lodge located at 1186 Worcester Road, Framingham, MA 01702.

133.    A.D.'s trafficker used this location multiple times from September 2014 until September 2015.

134.    A.D.'s trafficker used this location multiple times during 2014 and 2015 and each stay was for a period of days up to two weeks.

135.    On one particular occasion, during a two week stay at this location, an encounter was cancelled. The buyer still showed up and pulled a firearm on A.D. A.D. screamed and ran out of the room. A.D. ran to a housekeeper and asked for help. The housekeeper shoved her, walked into a room leaving her cart outside, and closed the door. A.D. then ran into the parking lot, in her underwear screaming, hiding behind the building until the coast was clear, and eventually ran back into her room and locked the door. Police were not called and no aid or assistance was provided to A.D. by hotel staff.

136.    Further, with each stay at the Econo Lodge, it resulted in several consistent red flags, including, but not limited to: paying for stays in cash; paying for extended stays on a day-by-day basis; requesting a room away from other guests; obvious signs of illegal drug use; frequent requests for linen changes; unusually large number of used condoms in the trash; unusually large number of male visitors asking for A.D. and her traffickers at the front desk; visible signs of prior and private physical abuse; unusually large number of male visitors coming in and out of the room; asking the front desk not to be disturbed; women wearing clothing

32

inappropriate for the weather; loud noises of abuse or other emergency audible to staff or other rooms; and loitering and soliciting on hotel grounds.

137. These red flags were open and obvious to anyone working at the Econo Lodge.

## DEFENDANTS' KNOWLEDGE OF SEX TRAFFICKING AT THEIR LOCATIONS

138. Defendants are aware that the hospitality industry is a major life source of the human trafficking epidemic both in the U.S. and abroad.[17] The United Nations,[18] international non-profits,[19] and the U.S. Department of Homeland Security,[20] have documented this well-known epidemic of human trafficking for years and brought particular attention to the indispensable role of hotels. Defendants cannot help but be aware of the public outcry against human trafficking, especially when so much of the uproar surrounds their industry.

139. For example, in 2004, End Child Prostitution and Trafficking ("ECPAT-USA") launched the Tourism Child-Protection Code of Conduct (the "Code") in the United

---

[17] Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

[18] *Global Report on Trafficking in Persons,* UNITED NATIONS OFFICE ON DRUGS AND CRIME (2020), 84 8available at https://www.unodc.org/documents/data-and-analysis/tip/2021/GLOTiP_2020_15jan_web.pdf; See also *We must act together to fight exploitation and human trafficking in tourism, say United Nations and international partners,* UNITED NATIONS OFFICE ON DRUGS AND CRIME (April 24, 2012) available at https://www.unodc.org/unodc/en/press/releases/2012/April/we-must-act-together-to-fight-exploitation-and-human-trafficking-in-tourism-say-united-nations-and-international-partners.html

[19] The Polaris Project and ECPAT-International have published extensive reports and professional toolkits on human trafficking in the hospitality industry for years.

[20] Human Trafficking and the Hospitality Industry, U.S. DEPARTMENT OF HOMELAND SECURITY (2020), available at https://www.dhs.gov/blue-campaign/hospitalityindustry; Hospitality Toolkit, U.S. DEPARTMENT OF HOMELAND SECURITY (2016), available at https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf

***LEAVE TO FILE GRANTED ON JANUARY 21, 2025***

States, identifying the steps companies would need to take to prevent child sex trafficking. ECPAT-USA identified hotel-specific best practices for preventing sex trafficking, such as: (1) not renting by the hour; (2) not permitting cash payments; (3) monitoring online sex ads such as Craigslist and Backpage for their hotel name and pictures of the rooms; (4) changing Wi-Fi passwords in rooms and cafes regularly; (5) watching for a trend of visitors to the same room; (6) being aware of rooms with excess condoms, lubricants, and towels; (7) requiring all visitors to be logged, including guest name, visitor name, arrival time, departure time, and room number.

140.    Further, nationwide campaigns have recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue and took initiative as early as 1997 with the United Nations Blue Heart Campaign[21] and domestically in 2010 with the Department of Homeland Security's Blue Campaign.[22] These efforts sought to educate both the public and private sectors on identifying and combatting human trafficking, including the hospitality industry and both campaigns released free online resources and toolkits publicly accessible to any entity concerned with human trafficking.

141.    On information and belief, Defendants have access to individual hotel location do-not-rent lists that often list reasons for the refusal to rent, including the suspicion of human trafficking. Defendants nevertheless do not share such information with

---

[21] *The Blue Heart Campaign,* UNITED NATIONS (2022), https://www.unodc.org/blueheart/#:~:text=The%20Blue%20Heart%20Campaign,help%20prevent%20this%20heinous%20crime.

[22] *DHS Blue Campaign Five Year Milestone*, DEP'T OF HOMELAND SECURITY (Jul. 22, 2015), https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.

other hotel locations, thereby preventing other of their hotel locations from acting to protect the victims of such suspected human traffickers.

142. Defendants also have access to public police reports, news reports and internal reports generated by customers and employees, regarding sex trafficking at their own hotel locations in particular.

143. Defendants have access to reviews left by guests on websites such as www.tripadvisor.com, www.yelp.com, www.google.com, and others, wherein guests frequently complain about the prevalence of obvious prostitution, hearing physical violence by pimps, and other signs of human trafficking.

144. A brief examination of just a handful of examples for each Defendant suffices to show the extraordinary frequency with which Defendants have long received and continue receiving evidence and reports that human trafficking runs rampant at their hotel locations. Their online reviews are replete with examples of patrons concerned about criminal activity and dangerous behavior.

## **DEFENDANTS FACILITATED THE TRAFFICKING OF A.D**

145. Most of these Defendants are a signatory of the Code[23] or other anti-trafficking pledges and thereby have promised to adopt these policies to combat trafficking. Yet, Defendants have failed to implement most, if not all these policies, and continue to unlawfully benefit from the trafficking on their properties.

146. Defendant Choice is a face and signatory to the ECPAT anti-trafficking knowledge, guidance, and information necessary to prevent human trafficking, and Choice publicly committed to participate in the programs shown to assist in identifying and

---

[23] *See Our Code Members,* ECPAT, https://www.ecpatusa.org/code-members

***LEAVE TO FILE GRANTED ON JANUARY 21, 2025***

preventing sex trafficking inside its brand hotels. Therefore, Choice should not only have created effective Brand standards for implementation, mandates, and operations, but also enforced them.

147.    Defendant Wyndham is a face and signatory to the ECPAT anti-trafficking knowledge, guidance, and information necessary to prevent human trafficking, and Wyndham publicly committed to participate in the programs shown to assist in identifying and preventing sex trafficking inside its brand hotels. Therefore, Wyndham should not only have created effective Brand standards for implementation, mandates, and operations, but also enforced them.

148.    Defendants Six Continents and Holiday Hospitality (through IHG) are a face and signatory to the ECPAT anti-trafficking knowledge, guidance, and information necessary to prevent human trafficking, and Six Continents and Holiday Hospitality publicly committed to participate in the programs shown to assist in identifying and preventing sex trafficking inside its brand hotels. Therefore, Six Continents and Holiday Hospitality should not only have created effective Brand standards for implementation, mandates, and operations, but also enforced them.

149.    Defendant Red Roof is a face and signatory to the ECPAT anti-trafficking knowledge, guidance, and information necessary to prevent human trafficking, and Red Roof publicly committed to participate in the programs shown to assist in identifying and preventing sex trafficking inside its brand hotels. Therefore, Red Roof should not only have created effective Brand standards for implementation, mandates, and operations, but also enforced them.

150.    Defendant ESA Management has an entire section of their web presence dedicated

36

***LEAVE TO FILE GRANTED ON JANUARY 21, 2025***

to the idea of human trafficking prevention. However, the events of this case would suggest that this outward display of support for the fight against human trafficking has not translated to trainings or programs to any meaningful outcome.[24]

151.    Defendants profited from the sex trafficking of Plaintiff A.D. Defendants rented rooms to and provided Wi-Fi to A.D.'s traffickers when they knew, or should have known, that human trafficking was prevalent within their branded properties and at the specific locations where A.D. was trafficked. The hotel staff, especially front desk staff, at Defendants' properties knew or should have known of the obvious signs of A.D.'s trafficking.

152.    Defendants benefited from the steady stream of income that A.D.'s traffickers and "johns" bring to their hotel brands. Defendants profited from each and every room that A.D.'s traffickers and customers rented where A.D. was harbored and maintained for the purpose of sex trafficking. In addition, Defendants profited from data collected each and every time A.D.'s traffickers and customers used Defendants' Wi-Fi to advertise and solicit A.D. for commercial sex.

153.    Defendants have made a public commitment to combat human trafficking, and thus, are aware that trafficking is a common problem in the hospitality industry. Defendants should have been aware of the benefits they were receiving from the human trafficking occurring at the locations where A.D. was trafficked given Defendants' access to information, such as police reports, news articles, complaints, and negative reviews regarding the specific locations and surrounding areas.

---

[24] https://www.extendedstayamerica.com/human-trafficking-prevention

154. Moreover, Defendants repeatedly collected data on A.D., her traffickers, and her "johns" from her many stays at Defendants' hotels, including but not limited to room reservations, identification and payment information, data from websites visited on Wi-Fi, and other guest data. Defendant's employees witnessed the obvious signs of A.D's trafficking including signs of abuse, frequent male visitors coming in and out of the room, condoms in the trash, loud yelling and fighting, and others. Despite having access to all this information for years, Defendants failed to take reasonable measures to stop benefitting from sex trafficking occurring in their hotels. If Defendants would have taken proper measures, Defendants would not have profited from A.D. and other victims like her being trafficked at their locations.

155. Defendants discussed, developed, and implemented uniform policies and procedures to identify, prevent and mitigate the risk of human trafficking occurring at their properties, including the hotels where A.D. was trafficked. These policies included ongoing communication with its local hotels by including articles about human trafficking in newsletters, announcements at annual conferences, alerts to hotels in high-risk areas or in proximity to high-risk events, and field-based associates who visit hotels specifically to discuss human and sex trafficking issues.

156. Pursuant to these policies, branded location employees and property management regularly reported customer data and other indicators of trafficking including suspicious criminal activity, web data indicating use of commercial sex websites, and data associated with reservations. The staff at the properties where A.D. was trafficked reported this to Defendants, or would have if Defendants did not fail to

***LEAVE TO FILE GRANTED ON JANUARY 21, 2025***

institute reasonable policies and procedures.

157.    In addition, Defendants had access to much of this data through the management of centralized data systems it required the branded properties to use, including but not limited to the property management, booking, credit processing, and information technology and internet systems.

158.    Defendants failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to stop reaping the benefits of sexual exploitation on their properties. Defendants maintained their deficiencies to maximize profits by:

   a.    Failing to mandate and minimizing costs of training employees and managers on how to spot the signs of human trafficking and sexual exploitation;

   b.    Lowering operating costs and management costs by failing to analyze the data they received regarding criminal activity and customer reviews that indicated sex trafficking was occurring and taking the steps necessary to remedy the problems;

   c.    Collecting and utilizing massive amounts of data from all of their branded locations for marketing and other profit-driven purposes but failing to utilize this same data to combat sex trafficking in their hotels;

   d.    Failing to refuse room rentals, or report guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers;

   e.    Failing to monitor and track guest wireless network use for illicit

***LEAVE TO FILE GRANTED ON JANUARY 21, 2025***

commercial sex purposes or digital activity associated with human trafficking.

f.    Failing to institute proper security measures, including, but not limited to, employing qualified security officers or appropriate cybersecurity measures to actively combat human trafficking and sexual exploitation; and

g.    Failing to use its power as a parent company to hold the franchisees accountable for contributing to the prevalence of sex trafficking on their properties.

159.    As a direct and proximate result of these egregious practices on the part of the Defendants, A.D – and victims of sex trafficking and exploitation like her – have been permanently injured and damaged physically, emotionally, psychologically, and financially.

**DEFENDANTS' CONTROL OVER THEIR BRAND HOTELS**

160.    Upon information and belief, it is a standard practice in the hospitality industry, followed by Defendants, for Parent Hotel Corporations to set exacting brand quality standards reaching everything from the temperature at which coffee shall be served, to the number of pillows that shall be placed on each bed, to the types of funds accepted, to when, where and how guests should be greeted.

161.    Defendants provide their branded properties with signage on and in front of the building intended to assure customers that, if they check into that hotel, they can expect an experience consistent with the standards of the parent hotel brand. The same brand is emblazoned on everything in the hotel, from the pens on the bedside table to the staff uniforms at the front desk.

***LEAVE TO FILE GRANTED ON JANUARY 21, 2025***

162.    Defendants provide their branded properties branded name recognition, a marketing campaign, and hotel listings in the Global Distribution System and other online travel agency databases, as well as hotel locations with access to their brand-wide central reservation systems, 800 numbers, revenue management tools, brand loyalty programs, and company websites.  Thus, booking and room reservations are to a large extent controlled by the Hotel Defendants. Defendants see booking and reservation trends, including for those branded hotels where Plaintiff was trafficked.[25]

163.    Upon information and belief, Defendants require its branded hotel properties to use a property management system, which is linked to Defendants' corporate network and data center, for, among other things, receiving reservations, and processing credit card transactions.

164.    Upon information and belief, per the relevant franchise agreements,[26] Defendants may enforce their brand standards by means of periodic inspections of their brand hotel locations, backed up with the ultimate threat of termination of the franchise agreement.

165.    Upon information and belief, per the relevant franchise agreements, the Hotel Defendants may enforce their brand standards by means of periodic inspections of hotel locations, backed up with the ultimate threat of termination of the franchise

---

[25] Where a branded hotel allows cash to be accepted for payment, monitoring and auditing these trends are important to identifying locations where criminal activity and commercial sex trafficking may be occurring.

[26] Most franchise disclosure documents, which outline the policies and procedures of franchise agreements, can be accessed publicly for free by making an account on https://fddexchange.com/view-fdd-docs.

***LEAVE TO FILE GRANTED ON JANUARY 21, 2025***

agreement.

166. Upon information and belief, the Hotel Defendants' brand standards are so strict as to bar entirely certain efforts to combat trafficking, for instance by prohibiting the prominent placement of informational signs within hotel rooms offering to help victims escape.

167. It is further a standard practice in the hospitality industry, upon information and belief, followed by all Hotel Defendants, for parent companies to exercise significant control over the employment decisions of their hotel locations.

168. The Hotel Defendants and their hotel locations exhibit a significant degree of interrelated, intermingled, and unified operations at the locations at which Plaintiff was trafficked. Upon information and belief, the Hotel Defendants promulgate policies, procedures, and standards governing the hiring, training, retention, and advancement of on-the-ground employees and setting their rates of pay, which together exert significant control over all employment decisions made at the individual hotel locations at which Plaintiff was trafficked.

169. On information and belief, the Hotel Defendants utilize some of these funds to monitor the brand standards and to offer training to hotel operators and franchisees.

170. Under federal labor regulations, the Hotel Defendants are each considered joint employers of the employees at their locations at which Plaintiff was trafficked.

171. As seen by citations herein to Defendants' websites, each shares or co-determine those matters governing the essential terms and conditions of employment  Each Defendant sets the essential terms and conditions of employment, including hiring, training, retention, advancement, and setting rates of pay.

42

***LEAVE TO FILE GRANTED ON JANUARY 21, 2025***

172. Specifically, the Hotel Defendants create and promulgate policies relating to training employees to recognize and respond to human trafficking, and the Hotel Defendants determine whether such training shall be mandatory.

173. Despite their knowledge that few, if any, employees at their hotel locations actually receive trainings if the same are not mandated, the Hotel Defendants have failed to mandate such training on any significant scale or at the specific locations where Plaintiff was trafficked.

174. On information and belief, the Hotel Defendants require their hotel locations to pay approximately 10% of gross revenue back to the Hotel Defendants for the privilege of using the Hotel Defendants' names and following their brand standards.

### CHOICE

175. Choice exercises day-to-day control over their properties and its other brand hotels through centralized corporate systems, training, policies, and brand standards. Choice implements and retains brand hotel control over, including control over the Quality Inn by Choice and Econo Lodge, as either direct subsidiaries or under the terms of its franchise agreements.

176. Upon information and belief, Choice controls the operations of its branded properties through a variety of means enforced through franchise agreements and related contracts, including but not limited to:

   a.   Requiring the branded locations to use Choice's property management system;

   b.   Gathering reports of data generated by branded locations including reservation, payment, and occupancy information through Choice's

***LEAVE TO FILE GRANTED ON JANUARY 21, 2025***

centralized systems;

c.    Requiring branded locations to keep audit reports and other records;

d    Conducting regular inspections for compliance with franchise agreement terms and Choice's rules and regulations;

e.    Providing marketing requirements and standardized marketing services for the branded locations;

f.    Regulating all the policies, procedures, and standards of the branded properties from the front desks to the bathrooms;

g.    Requiring branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

h.    Requiring branded locations to install Choice's data transport system to share data with Choice corporate;

i.    Providing training and orientation materials for branded property staff;

j.    Requiring branded locations to make modifications to the branded properties upon Choice's request and to refrain from make substantial changes to the branded property without Choice's permission;

k.    Regulating the rates for room rentals; and

l.    Insurance coverage requirements.[27]

177.    Choice manages corporate and branded property training, policies, and procedures on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel

---

[27] See e.g. Comfort Inn 2020 Franchise Disclosure Document, https://fddexchange.com/view-fdd-docs/comfort-inn-2020-fdd-franchise-information-costs-and-fees/

***LEAVE TO FILE GRANTED ON JANUARY 21, 2025***

brand related policies published and communicated via property management systems with back-end management by Choice.[28]

178.    Choice controls uniform and required reservation, marketing, customer support systems and loyalty programs at its branded hotels through national press releases, newsletters, emails, announcements on Choice's website, and mentions across its corporate media channels.[29]

179.    Choice mandates usage of a cloud-based centralized property management system called ChoiceADVANTAGE to its branded locations.[30]

180.    Choice controls all hotel reservations made across its branded locations on its centralized reservation system called Choice Edge.[31]

181.    Through its national sales team, Choice controls the credit processing system and the centralized direct billing at its brand hotels, including the Massachusetts Econo Lodge and Quality Inn by Choice.[32]

182.    Choice gathers data from its customers including names, payment information, reservation history, browsing data, other details associated with their stay for promotional and guest safety reasons.[33]

183.    Upon information and belief, Choice requires its hotels to carry Wi-Fi internet

---

[28] *See* e.g. *Why Choice?,* CHOICE, https://choicehotelsdevelopment.com/why-choice (last visited Jun. 9, 2022). id. ("We've taken our teams' collective knowledge of hotel operations, technology, service and leadership, and developed the tools and resources our owners use every day to help run their businesses.").

[29] *Id.*

[30] *Connect the world through the power of hospitality*, CHOICE, https://www.choicehotels.com/about

[31]  *Supra* n 101

[32] *Id.*

[33] Choice Hotels International, Inc. *Privacy & Security Policy,* https://www.choicehotels.com/legal/privacy-policy

***LEAVE TO FILE GRANTED ON JANUARY 21, 2025***

access with certain cybersecurity measures in place which gives Choice the ability to access, monitor, and harvest that internet data.

184. Under the guise of maintaining its "brand standards," Choice also forces its branded hotels to frequently undertake expensive renovations, remodeling, and construction efforts, as well as purchase mandated products with limited warranties which are shortened by such onerous and exorbitant requirements.[34]

185. Choice requires branded properties to comply with its corporate policies relating to Security and Guest Safety, Human Rights, Ethics, Corporate Governance, and compliance with the law.[35]

## WYNDHAM

186. Wyndham exercises day-to-day control over Wyndham Branded Properties and its other brand hotels through centralized corporate systems, training, policies, and brand standards. Wyndham implements and retains brand hotel control over, including control over the Days Inn located 889 Boston Turnpike, Shrewsbury, MA 01545, where A.D. was trafficked, as either direct subsidiaries or under the terms of its franchise agreements.

187. Upon information and belief, Wyndham controls the operations of its branded properties through a variety of means enforced through franchise agreements and related contracts, including but not limited to:

---

[34] *See e.g.*, *Convert an Existing Hotel*, CHOICE HOTELS, https://choicehotelsdevelopment.com/convert-a-hotel/#upscale (last visited Jun. 9, 2022).

[35] Choice claims to "strive to conduct [its] business operations free from violations of human rights" *See Human Rights Policy*, CHOICE HOTELS, https://www.choicehotels.com/about/responsibility/human-rights-policy (last visited Jun. 6, 2022).

***LEAVE TO FILE GRANTED ON JANUARY 21, 2025***

a.    Requiring the branded locations to use Wyndham's property management system;

b.    Requiring branded locations to keep audit reports and other records;

c.    Conducting regular inspections, quality assurance evaluation reports, and audits for compliance with franchise agreement terms and Wyndham's corporate policies;

d.    Gathering reports of data generated by branded locations including reservation, payment, and occupancy information through Wyndham's centralized systems;

e.    Requiring the brands to regularly report data regarding customer feedback to Wyndham;

f.    Providing marketing requirements and standardized marketing services for the branded locations;

g.    Regulating the all the policies, procedures, and standards of the branded properties from the front desks to the bathrooms;

h.    Requiring branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access, security, filtering;

i.    Providing training and orientation materials for branded property staff;

j.    Requiring branded locations to make modifications to the branded properties upon Wyndham's request and to refrain from make substantial changes to the branded property without Wyndham's permission;

k.    Requiring branded properties to comply with Wyndham's Human Rights Policy and other laws;

47

***LEAVE TO FILE GRANTED ON JANUARY 21, 2025***

l.      Regulating the rates for room rentals; and

m.      Insurance coverage requirements.[36]

188.    Wyndham manages corporate and branded property training, policies, and procedures on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand related policies published and communicated via property management systems with back-end management by Wyndham.[37]

189.    Wyndham controls uniform and required reservation, marketing, customer support systems and royalty programs at its branded hotels through national press releases, newsletters, emails, announcements on Wyndham's website, and mentions across its corporate media channels.[38]

190.    Through its national sales team, Wyndham controls the credit processing system and the centralized direct billing at its brand hotels, including the Massachusetts Wyndham Branded Properties where A.D. was trafficked.[39]

191.    Wyndham mandates branded properties source through Wyndham's global distribution system.[40] Wyndham mandates the use of specific vendors and suppliers for the purchase of goods and services at its brand hotels, including the

---

[36] *See e.g.* 2014 Franchise Disclosure Document https://fddexchange.com/wp-content/uploads/2014/03/Days-Inn-Franchise-Disclosure-Document-FDD-July-12-2012.pdf
[37] *Our Brands*, WYNDHAM HOTELS, https://www.wyndhamhotels.com/wyndham-rewards/our-brands (last visited Jun. 15 2022).
[38] *Benefits of Partnering with Wyndham Hotels & Resorts,* WYNDHAM HOTELS, CHOICE, https://development.wyndhamhotels.com/the-wyndham-advantage/ (last visited Jun. 15, 2022).
[39] *Id.*
[40] *Benefits of Partnering with Wyndham,* WYNDHAM, https://development.wyndhamhotels.com/the-wyndham-advantage/ (last visited Jun. 20, 2022).

Massachusetts Wyndham Branded Properties where A.D was trafficked.[41]

192.   Wyndham regulates property rate, inventory availability, and overall revenue management for the branded locations by monitoring hotel booking data for trends and patterns.[42]

193.   Wyndham manages its branded properties through its Oracle Hospitality OPERA Cloud Property Management System.[43] Wyndham's Development and Sourcing teams negotiate contracts on behalf of brands for hotel infrastructure, operating supplies and equipment and food and beverage.[44]

194.   Wyndham sets and controls Wi-Fi qualifications and/or Wi-Fi qualified service providers, language and policy used on internet landing pages, thresholds for cybersecurity, filtering and/or other guest internet protections, systems used to monitor customer reviews and responses, and other systems related to the daily operations at its brand hotels, including the Massachusetts Wyndham Branded Properties where A.D. was trafficked.[45]

195.   Wyndham is the employer of the staff at its branded properties. For example, Wyndham posts all hotel jobs on its parent website.[46] Wyndham is also responsible

---

[41] *See e.g., id* ("[Our goal is to ensure the design and construction of your hotel is as seamless as possible, guided by the appropriate brand standards.")

[42] Id.

[43] *Wyndham Implements Oracle Hospitality OPERA Cloud Property Management in its Full-Service Hotels,* HOTEL TECHNOLOGY NEWS (May 18, 2021), https://hoteltechnologynews.com/2021/05/wyndham-implements-oracle-hospitality-opera-cloud-property-management-in-its-full-service-hotels/

[44] *Supra* n 103

[45] *Leveraging technology to deliver an exceptional guest experience,* WYNDHAM (Summer 2021) 4, https://developmentsupport.wyndham.com/files/8516/2869/4484/Tech-Guide-Q3-2021.pdf

[46] *Join the Wyndham Family,* WYNDHAM, https://careers.wyndhamhotels.com/ (last visited Jun. 22, 2022)

***LEAVE TO FILE GRANTED ON JANUARY 21, 2025***

for setting the core values and culture for all Wyndham employees.[47] In addition, Wyndham sets forth policies for, and provides employee benefits.[48]

196.    Wyndham first adopted a Human Rights Statement in 2007. According to the updated 2018 policy, Wyndham promises to comply with human rights laws and standards and has "accountability mechanisms" in place to monitor and report on compliance. Brand locations are required to comply with human rights and "operating standards." Failure to comply can result in the termination of the franchise agreement.[49]

## SIX CONTINENTS AND HOLIDAY HOSPITALITY

197.    Six Continents and Holiday Hospitality exercise day-to-day control over the Crowne Plaza, Holiday Inn Express, and its other brand hotels say it collects information such as contact information, demographics, financial information, government-issued identification numbers, accommodation preferences, location, IP addresses, and social media content from hotel guests and website users.[50]

198.    Six Continents and Holiday Hospitality mandate that the design of the branded property complies with their brand standards and require branded locations to source from approved vendors.

199.    Six Continents and Holiday Hospitality's team of corporate sales professionals

---

[47] *About Wyndham,* WYNDHAM, https://careers.wyndhamhotels.com/content/About-Wyndham/#culture (last visited Jun 22, 2022)
[48] *Our Benefits,* WYNDHAM, https://careers.wyndhamhotels.com/content/Our-Benefits/?locale=en_US (last visited Jun 22, 2022)
[49] *Human Rights Statement,* http://q4live.s22.clientfiles.s3-website-us-east-1.amazonaws.com/153757806/files/doc_downloads/governance_documents/Wyndham-Hotel-Resorts-Human-Rights-Policy-Statement.pdf (last visited Jun. 15, 2022).
[50] *Privacy Statement,* IHG, https://www.ihg.com/content/us/en/customer-care/privacy_statement (last visited June 22, 2022) [45] *Supra* n 112.

***LEAVE TO FILE GRANTED ON JANUARY 21, 2025***

oversees business development and revenue generation and manages business-to-business relationships for the branded properties.[51]

200.    Six Continents and Holiday Hospitality require branded properties to use their corporate marketing and advertising resources and materials including online print, televisions, and high-profile sports and event sponsorships.[52]

201.    Six Continents and Holiday Hospitality require branded properties to use their centralized multi-channel reservation platform.[53]

202.    Six Continents and Holiday Hospitality's corporate revenue management team fixes the prices of room rentals at the branded properties to maximize profits, as well as make recommendations to brands to maximize revenues.[54]

203.    Six Continents and Holiday Hospitality require branded properties to use their centralized corporate property management and operations system called FPS Leads.[55]

204.    Six Continents and Holiday Hospitality control and provide centralized technology systems for hotel operations at its brand hotels, including systems its brand hotels must use to access shared customer data and reservations information. They also set and controls Wi-Fi qualifications and/or Wi-Fi qualified service providers, language and policy used on internet landing pages, thresholds for cybersecurity, filtering and/or other guest internet protections, systems used to monitor customer reviews and responses, and other systems related to the daily

---

[51] *Id.*
[52] *Id.*
[53] *Id.*
[54] *Id*.
[55] *Id.*

***LEAVE TO FILE GRANTED ON JANUARY 21, 2025***

operations at its brand hotels, including the Holiday Inn Express and Crowne Plaza.[56]

205.    Six Continents and Holiday Hospitality post job openings for its branded properties on its central career posting website "careers.ihg.com."[57] Six Continents and Holiday Hospitality provide benefits to employees of its branded properties, and upon information and belief, control the terms and conditions of their employment.[58]

206.    Six Continents and Holiday Hospitality require branded properties to comply with their corporate policies relating to Security and Guest Safety, Human Rights, Codes of Conduct, Corporate Governance, UN Global Compact commitments, and compliance with the law.[59]

### RED ROOF

207.    Red Roof exercises day-to-day control over the Red Roof and its other brand hotels through centralized corporate systems, training, policies, and brand standards. Red Roof implements and retains brand hotel control, including control over the Red Roof, as either direct subsidiaries or under the terms of its franchise agreements.

208.    Red Roof controls the operations of its branded properties through a variety of means enforced through franchise agreements and related contracts, including but

---

[56] *Id.*

[57] *Join our extraordinary world,* IHG, https://careers.ihg.com/en/ (last visited Jun. 22, 2022)

[58] Matt Lennon, *IHG revamps staff benefits to boost talent attraction and retention,* Hotel Management (Sept. 21, 2022) https://www.hotelmanagement.com.au/2021/09/21/ihg-revamps-staff-benefits-to-boost-talent-retention/

[59] *Policies,* IHG, https://www.ihgplc.com/en/responsible-business/policies#:~:text=At%20IHG%2C%20we%20are%20committed,processes%20to%20uphold%20our%20co mmitment. (last visited Jun. 22, 2022)

***LEAVE TO FILE GRANTED ON JANUARY 21, 2025***

not limited to:

a.   Providing the software, hardware, and platforms where data and information is shared with Red Roof corporate;

b.   Providing reservation platforms where payment modes and suspicious reservations would suggest trafficking;

c.   Providing training and education to branded hotels through webinars, seminars, conferences, and online portals;

d.   Providing and controlling customer review and response platforms;

e.   Hosting online bookings on Red Roof's domain;

f.   Requiring branded hotels to use Red Roof's customer rewards program;

g.   Requiring branded hotels to use Red Roof's property management software;

h.   Requiring branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

i.   Providing IT support for all property management systems, owned, operated, and required by Red Roof;

j.   setting employee wages;

k.   sharing profits;

l.   standardizing training methods for employees;

m.   building and maintaining the facility in a manner specified by the owner;

n.   standardized or strict rules of operation;

o.   regular inspection of the facility and operation by owner; and

p.   fixing prices.[60]

---

[60] *See* 2021 Franchisee Disclosure Document,

209.    Red Roof manages corporate training, policies, and procedures on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand related policies published and communicated via property management systems with back-end management by Red Roof.[61]

210.    Red Roof controls uniform and required reservation, marketing, customer support systems and loyalty programs at its brand hotels, including the Massachusetts RRI.[62] Red Roof also advertises its brand hotels through national press releases, newsletters, emails, announcements on redroof.com, and mentions across its corporate media channels.[63]

211.    Red Roof requires its hotels to use a consolidated IT system and database for property management, credit processing and centralized billing, as well as problem-tracking to ensure all problems are resolved promptly and that emergencies are escalated.[64]

---

https://franchimp.com/?page=pdf&f=105990_2021.pdf

[61] *See e.g.*, *Brand Support*, RED ROOF, https://www.redrooffranchising.com/brand-support (last visited Jun. 9, 2022) ("We support our franchisees with extensive on-site training. On everything from helping with pricing strategy and operational expense management, to assistance with marketing and operation programs…Our cost-effective sourcing solutions, efficient technology support, and incredible property management system add even more value to your Red Roof franchise.")

[62] *Id.*

[63] *Brand Marketing*, RED ROOF, https://www.redrooffranchising.com/brand-marketing (last visited Jun. 9, 2022) ("From your grand opening to being fully operational, our team helps you market your property every step of the way. We provide property-specific design services for print materials—like flyers and rack cards—and even help with billboards, transit advertising, and other local promotional needs.")

[64] *See* Red Roof Franchising, available at https://www.redrooffranchising.com/technology; *See also Sales Team,* RED ROOF, https://www.redrooffranchising.com/sales-team (last visited Jun. 9, 27 2022) (corporate Red Roof employees provide brand staff with "regional events, webinars,

***LEAVE TO FILE GRANTED ON JANUARY 21, 2025***

212. Red Roof boasts of its "Streamlined Technology" and "Shared Success" with its brand hotels. To "make operations as easy and seamless as possible," Red Roof controls "a fully integrated database" which its brand hotels must use to access customer data and reservations, among other information shared system-wide between Red Roof and its brand hotels.[65] Red Roof's privacy policy states that it collects information such as contact information, demographics, financial information, government-issued identification numbers, accommodation preferences, location, IP addresses, and social media content from hotel guests.[66]

213. Red Roof also sets and controls Wi-Fi qualifications and/or Wi-Fi qualified service providers, language and policy used on internet landing pages, thresholds for cybersecurity, filtering and/or other guest internet protections, systems used to monitor customer reviews and responses, and other systems related to the daily operations at its brand hotels, including the Massachusetts RRI.[67]

214. In addition, through an integrated corporate marketplace, Red Roof mandates the use of specific vendors and suppliers for the purchase of goods and services at its brand hotels, including the Massachusetts RRI by Red Roof.[68]

215. Under the guise of maintaining its "brand standards," Red Roof forces its brand

---

and in-person visits" alongside training, other support, and "RediBill® Brand-Wide Direct Billing" centralized billing program).

[65] *Technology*, RED ROOF, https://www.redrooffranchising.com/technology (last visited Jun. 9, 2022); see also *Privacy Policy*, RED ROOF, https://www.redroof.com/privacy-policy (last visited Jun. 9, 2022).

[66] *Id.*

[67] *See* sigmawifi Red Roof Inn Case Study, *available at* https://www.sigmawifi.com/red-roof-inn-nh-case-study/

[68] See *Operational Support Procurement Services*, RED ROOF, https://www.redrooffranchising.com/operational-support (last visited Jun. 6, 2022).

***LEAVE TO FILE GRANTED ON JANUARY 21, 2025***

hotels to frequently undertake expensive renovations, remodeling, and construction efforts, as well as purchase mandated products with limited warranties which are shortened by such onerous and exorbitant requirements.[69]

216.   Red Roof posts job openings for its branded properties on its central career positing website.[70] Red Roof provides benefits to employees of its branded properties, and upon information and belief controls the terms and conditions of their employment.[71]

### ESA MANAGEMENT, LLC

217.   ESA Management exercises day-to-day control over the Extended Stay America branded properties and its other brand hotels through centralized corporate systems, training, policies, and brand standards. ESA Management implements and retains brand hotel control, including control over the Red Roof, as either direct subsidiaries or under the terms of its franchise agreements.

218.   Upon information and belief, ESA Management controls the operations of its branded properties through a variety of means enforced through franchise agreements and related contracts, including but not limited to:

a.   Providing the software, hardware, and platforms where data and information is shared with ESA Management corporate;

b.   Providing or utilizing and monitoring reservation platforms where payment modes and suspicious reservations would suggest trafficking;

c.   Providing training and education to branded hotels through webinars,

---

[69] *See Design and Construction,* RED ROOF, https://www.redrooffranchising.com/design-and-constuction (last visited Jun. 9, 2022).
[70] *See* https://www.redroofjobs.com/
[71] *Id.*

56

***LEAVE TO FILE GRANTED ON JANUARY 21, 2025***

seminars, conferences, and online portals;

d.    Providing and controlling customer review and response platforms;

e.    Hosting online bookings on Extended Stay America domain;

f.    Requiring branded hotels to use ESA Management customer rewards program;

g.    Requiring branded hotels to use ESA Management property management software;

h.    Requiring branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

i.    Providing IT support for all property management systems, owned, operated, and required by ESA Management;

j.    setting employee wages;

k.    sharing profits;

l.    standardizing training methods for employees;

m.    building and maintaining the facility in a manner specified by the owner;

n.    standardized or strict rules of operation;

o.    regular inspection of the facility and operation by owner; and

p.    fixing prices.[72]

219.    ESA Management manages corporate training, policies, and procedures on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand related policies published and communicated via property management

[72] *See* 2021 Franchisee Disclosure Document, https://franchimp.com/?page=pdf&f=105990_2021.pdf

systems with back-end management by ESA Management.

220.    ESA Management controls uniform and required reservation, marketing, customer support systems and loyalty programs at its brand hotels, including the Massachusetts Extended Stay America properties. ESA Management also advertises its brand hotels through national press releases, newsletters, emails, announcements on extendedstayamerica.com, and mentions across its corporate media channels.

221.    Upon information and belief, ESA Management requires its hotels to use a consolidated IT system and database for property management, credit processing and centralized billing, as well as problem-tracking to ensure all problems are resolved promptly and that emergencies are escalated.

222.    In addition, through an integrated corporate marketplace, ESA Management mandates the use of specific vendors and suppliers for the purchase of goods and services at its brand hotels, including the Massachusetts Extended Stay America.

223.    Under the guise of maintaining its "brand standards," ESA Management forces its brand hotels to frequently undertake expensive renovations, remodeling, and construction efforts, as well as purchase mandated products with limited warranties which are shortened by such onerous and exorbitant requirements.

224.    ESA Management posts job openings for its branded properties on its central career positing website. Extended Stay America provides benefits to employees of its branded properties, and upon information and belief controls the terms and conditions of their employment.[73]

---

[73] https://www.extendedstayamerica.com/

58

***LEAVE TO FILE GRANTED ON JANUARY 21, 2025***

## CAUSES OF ACTION

### COUNT 1: 18 U.S.C. § 1595 ("TVPRA")
### (AGAINST ALL DEFENDANTS)

225. Plaintiff incorporates each foregoing allegation.

226. Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a) and is entitled to bring a civil action under 18 U.S.C. §1595.

227. Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. § 1595. Specifically, Defendants had a statutory obligation not to benefit financially or receive anything of value from a venture that they knew, or should have known, engaged in violating the TVPRA. At all relevant times, Defendants breached this duty by facilitating violations of the TVPRA through their participation in the harboring, maintaining, soliciting, and advertising of Plaintiff and her traffickers for the purposes of commercial sex induced by force, fraud, or coercion.

228. Defendants have benefited as a result of these acts, omissions, and/or commissions by renting rooms and providing Wi-Fi to traffickers and customers, keeping operating costs low, maintaining the loyal customer base that fuels the supply and demand of sex trafficking, and limiting mandatory regulations. Moreover, on each occasion, they received payment for rooms or received payments or kickbacks for internet usage, Defendants directly benefitted from the sex trafficking of Plaintiff when they knew or should have known violations of §1591(a) were occurring. The actions, omissions, and/or commissions alleged in this pleading were the "but for" and proximate cause of Plaintiff's injuries and damages.

229. Plaintiff has suffered substantial physical and psychological injuries as the result of

***LEAVE TO FILE GRANTED ON JANUARY 21, 2025***

being trafficked and sexually exploited at Defendants' hotels and properties.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests judgment as follows:

a.  Awarding Plaintiff all available compensatory damages for each cause of action, including but not limited to past and future medical expenses; past and future lost wages and loss of earning capacity; past and future emotional distress; consequential and/or special damages; all available noneconomic damages, including but not limited to pain, suffering, and loss of enjoyment of life;

b.  Disgorgement of profits obtained through unjust enrichment;

c.  Restitution;

d.  Statutory and/or treble damages, where available;

e.  Punitive damages;

f.  Attorneys' fees and expenses;

g.  The costs of this action;

h.  Pre- and post-judgment interest; and

i.  Any other relief the Court or jury deems appropriate.

## **JURY DEMAND**

THE PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL COUNTS SO TRIABLE.

[remainder of this page is intentionally blank]

***LEAVE TO FILE GRANTED ON JANUARY 21, 2025***

Respectfully submitted,
The Plaintiff,
A.D., an individual,
By her attorneys,

*/s/ Michael Glennon*
Michael Glennon, BBO# 678977
BRODY, HARDOON, PERKINS & KESTEN, LLP
265 Franklin Street, 12th Floor
Boston, MA 02110
(617) 880-7100
mglennon@bhpklaw.com

DATED: January 21, 2025

## CERTIFICATE OF SERVICE

I hereby certify that this document was filed through the ECF system and will therefore be sent electronically to the registered participants as identified on the Notice of Electric Filing (NEF) and paper copies will be sent this day to those participants indicated as non-registered participants.

*/s/ Michael Glennon*
Michael Glennon

DATED: January 21, 2025

61